Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| JORGE MARTÍNEZ LLERAS<br><br>Apelado<br><br>v.<br><br>LAND OF FREEDOM P.R. INC. Y ASEGURADORA UNIVERSAL INSURANCES COMP.<br><br>Apelante | KLCE202500302 | *Certiorari* acogido como Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Mayagüez<br><br>Caso núm. MZ2023CV00041<br><br>Sobre: Violación de Derechos Civiles |

Panel integrado por su presidente, el Juez Bonilla Ortiz, la Jueza Mateu Meléndez y la Juez Lotti Rodríguez[1].

Lotti Rodríguez, Juez Ponente

### S E N T E N C I A

En San Juan, Puerto Rico a 14 de julio de 2025.

El apelante, Land of Freedom Puerto Rico, INC (LOF), solicita que revoquemos la *Sentencia Parcial Nunc Pro Tunc* emitida el 18 de febrero de 2025, en la que el Tribunal de Primera Instancia, Sala de Mayagüez (TPI), declaró Con Lugar la *Moción de Sentencia Sumaria Parcial* a favor del apelado, Jorge Martínez Lleras (señor Martínez Lleras), al concluir que LOF fue negligente de la supervisión de Jorge Martínez Roldán (Jorge o residente).

### I.

El 13 de enero de 2023 el señor Martínez Lleras, presentó *Demanda* en daños en contra de LOF por la muerte de su hijo, Jorge (QEPD), al no supervisarlo o cuidarlo adecuadamente mientras recibía tratamiento para su adicción a drogas en sus facilidades.[2]

---

[1] Conforme la OATA2025-078, se asignó a la Hon. Glorianne Lotti Rodríguez en sustitución del Hon. Juan R. Hernández Sánchez.
[2] Sistema Unificado de Manejo y Administración de Casos (SUMAC), Entrada Núm. 1.

Número Identificador

SEN2025 _____

Por su parte, el 22 de mayo de 2023, LOF presentó su *Contestación a Demanda.*[3]

Luego de varios incidentes procesales, el 28 de agosto de 2024, LOF presentó *Moción de Sentencia Sumaria*[4] en la que sostuvo que no hay nexo causal para que se le adjudique la negligencia. El 17 de septiembre de 2025 el señor Martínez Lleras presentó *Oposición a Solicitud de Sentencia Sumaria y Solicitud de Sentencia Sumaria Parcial en favor de la Parte Demandante*[5], la cual el 16 de octubre de 2025 LOF replicó mediante el *Escrito en Cumplimiento de Orden, En Oposición a Solicitud De Sentencia Sumaria Parcial en Favor de la Parte Demandante y Reiterando Solicitud de Sentencia Sumaria a Favor De La Parte Demandada*[6].

Así pues, mediante *Sentencia Parcial*[7] ,el 13 de enero de 2025, el TPI declaró Ha Lugar la *Solicitud de Sentencia Sumaria Parcial* a favor del señor Martínez Lleras. Esto, ya que LOF fue negligente en el cuidado del joven Jorge, lo cual tuvo como consecuencia su muerte. En síntesis, dicho foro entendió que hubo un quebrantamiento de la Ley 67-1993, según enmendada, *Ley de la Administración de Servicios de Salud Mental y Contra la Adicción*, 3 LPRA sec. 402 *et seq.* (Ley ASSMCA), la Ley Núm. 408 de 2 de octubre de 2000, según enmendada, *Ley de Salud Mental de Puerto Rico,* 24 LPRA sec. 6152 *et seq.* (Ley 408-2000) y el Reglamento para la Certificación y Licenciamiento de las Instituciones Públicas y Privadas dedicadas a la Prevención, Tratamiento y Rehabilitación de Personas con Trastornos Mentales, Adicción o Dependencia a Sustancias incluyendo el Alcohol, Tabaco y Programas de Ayuda al Empleado, Reglamento Núm. 8283 de 30 de noviembre de 2012

---

[3] SUMAC, Entrada Núm. 26.
[4] SUMAC, Entrada Núm. 48.
[5] SUMAC, Entrada Núm. 53.
[6] SUMAC, Entrada Núm. 55.
[7] SUMAC, Entrada Núm. 59.

(Reglamento Núm. 8283) (derogado)[8]. En específico, el TPI resolvió que no se cumplieron con los trece (13) principios de tratamiento efectivo por el "National Institute on Drug Abuse", así como en:

> El posible uso de drogas durante el tratamiento debe ser constantemente supervisado. Durante el período de tratamiento pueden haber recaídas al uso de drogas. La supervisión objetiva del uso de drogas y alcohol durante el tratamiento, incluyendo análisis de la orina u otros 'exámenes, puede ayudar al paciente a resistir sus impulsos de usar drogas. Esta clase de supervisión también puede proporcionar una evidencia temprana del uso de drogas para que el plan de tratamiento del paciente pueda ser reajustado. Dar a conocer los resultados de los informes a los pacientes que registren positivamente en los análisis de drogas, puede servir como un elemento importante en la supervisión. Artículo 8, Capítulo III del Reglamento Núm. 8283.

Además, sostuvo que LOF admitió bajo juramento la negligencia y nexo causal de este mismo, debido a las violaciones con la Sección 16 de la Ley ASSMCA; el Art. 1.06 (oo) y el Art. 13.01 de la Ley 408-2000. Asimismo, determinó que el apelante fue negligente por la ausencia de supervisión y vigilancia adecuada del residente en sus facilidades. También, argumentó que la prueba evidenció craso incumplimiento de parte del apelante. A manera de ejemplo, expuso que a los tres (3) meses de ser admitido a LOF, dio positivo a Marihuana en una prueba de dopaje.

Por último, en dicho dictamen, el TPI esbozó las siguientes determinaciones de hechos:

1. Jorge nació el 27 de mayo de 1997, en Caguas, Puerto Rico, hijo de Martínez y Maritza Sánchez Roldán, en adelante la madre.

2. Sus padres no estaban casados legalmente por lo que la madre acudió al Tribunal para pedir su custodia, la fijación de alimentos y de relaciones paternofiliales, que Martínez cumplió.[9]

---

[8] El Reglamento Núm. 8283 aplica a los hechos este caso por estar vigente en aquel momento.

[9] Véase, Transcripción de la Deposición del señor Martínez Lleras, pág. 10, L. 17-20: y pág. 11, L. 2-9.

3. En su adolescencia, Jorge comenzó a consumir Marihuana. Martínez, advertido de ello, habló con él y decidieron que se involucrara en los deportes, cosa que redundó en un mejor aprovechamiento académico de su parte. Además, Martínez comenzó a involucrarse más en las actividades escolares de Jorge.[10]

4. Tiempo después, Jorge comenzó a consumir Heroína y Martínez dialogó con su madre y con él, recomendándoles que se gestionara ayuda psicológica y psiquiátrica; y si fuera necesario, que fuese hospitalizado.[11]

5. En 2016, Martínez se domicilió en el estado de Florida, Estados Unidos de América. Para esa fecha, Jorge tenía 19 años de edad.[12]

6. Jorge hizo un bachillerato en enfermería.[13]

7. Estando en Puerto Rico, Jorge incursionó en Cocaína, Zanax, Percocet, Metanfetaminas, Crack, Alucinógenos y Alcohol.

8. Jorge fue a vivir con su padre a Florida y logró dejar las drogas por ese tiempo. El padre, incluso, le consiguió empleo en un parque de diversiones.

9. Eventualmente, Jorge regresó a Puerto Rico y aprobó la reválida de enfermería.[14]

10. Estando aquí, Jorge recayó en el uso de drogas.

11. El 15 de diciembre de 2020, su madre lo recluyó en el Hospital Panamericano, donde estuvo hasta el 20 de diciembre de ese año, porque había presentado "deterioro afectivo y conduct[ual] a raíz de uso problemático de sustancias".

12. En ese periodo la psiquiatra a su cargo, Carmen Brito Medina, le proveyó "farmacoterapia, sicoterapia y equipo multidisciplinario[,] alcanzado el máximo beneficio terapéutico sin evidencia de efectos adversos al mismo".

---

[10] Íd., pág. 10, L. 7-16; pág. 11, L. 23-24; pág. 12, L. 1-5; y pág. 13, L. 1-14.
[11] Íd., pág. 13, L. 18-24; y pág. 14, L. 1-4.
[12] Íd., pág. 8, L. 1-9.
[13] Id., pág. 9, L. 22-24; y pág. 10, L. 1-6.
[14] Íd., pág. 10.

13.     La madre, mientras, el 16 de diciembre de 2020, presentó una petición de reclusión involuntaria ante el Tribunal al amparo de la Ley 408-2000, Ley de Salud Mental, que tiene el número EGCI202000105.

14.     El 24 de febrero de 2021, el Tribunal desestimó dicha petición por dos razones: a. el Hospital no le proveyó una certificación o recomendación del psiquiatra, en conjunto con el equipo inter o multidisciplinario, recomendado tratamiento compulsorio; y 2. Jorge se había recluido voluntariamente en LOF.[15]

15.     Al alta del Hospital Panamericano, la psiquiatra a cargo le recetó Prozac; Seroquel; Trazodone; y Klonopin". Además, le recomendó a LOF que le proveyera a Jorge tratamiento psiquiátrico ambulatorio en siete días y que "continuar[a] la farmacoterapia y la sicoterapia".[16]

16.     El 11 de agosto de 2008, Joel Seda Olmo, *en adelante Seda*, y su esposa incorporaron LOF como una corporación doméstica sin fines de lucro y oficinas en la Calle Almirante #401, Urb. Alturas de Mayagüez, Mayagüez, Puerto Rico.[17]

17.     LOF se dedicaría a "[l]levar la palabra de Dios en la formación espiritual" y a "[b]rindar servicios integrales especializados a personas con problemas de adicción y/o abuso de alcohol o sustancias controladas". Para ello, le representaron al Secretario de Estado que se contrataría "el personal licenciado".[18]

18.     Seda tiene cuarto año de escuela superior. Entre 1992 y junio de 2004, fue usuario activo "de drogas y alcohol".[19]

19.     La mayoría de los empleados de LOF para la fecha de los hechos que informan el caso de epígrafe también habían sido usuarios de drogas y alcohol.[20]

---

[15] SUMAC, Entrada Núm. 53, Anejo 2 (Sentencia).
[16] SUMAC, Entrada Núm. 53, Anejo 3 (Récord médico del Panamericano).
[17] Véase, Transcripción de la Deposición del señor Seda Olmo, pág. 12, L. 4-24.
[18] Ver Artículos de Incorporación de LOF.
[19] Véase, Transcripción de la Deposición del señor Seda Olmo, pág. 12, L. 4-24.
[20] Íd., pág. 39, L. 4-18.

20.      [21]Seda recibió tratamiento para su adicción y alcoholismo en "House of Freedom" en el estado de Florida, Estados Unidos de América. Al alta, comenzó a trabajar con deambulantes en dicho estado. Además, cursó estudios bíblicos ordenándose pastor.[22]

21.      En 2009, LOF comenzó operaciones en el Barrio Río Cañas Arriba de Mayagüez.[23]

22.      Para agosto de 2021, LOF contaba con una licencia provisional expedida por AMMSCA para operar una facilidad de tiempo prolongado en el Bo. Piedras Blancas de San Sebastián, Puerto Rico, hasta el 8 de junio de 2021. La misma le fue extendida hasta el 31 de diciembre de ese año, por razón de la Pandemia del COVID, mediante la Orden 2021-02.[24]

23.      El tratamiento que le brinda LOF a sus residentes se extiende por 15 meses, 12 de los cuales están recluidos en sus facilidades.[25]

24.      El tratamiento consiste en "llevar la palabra del Señor y brindar herramientas terapéuticas para sacar a la persona del problema de adicción".[26]

25.      LOF solo cuenta con un consejero en adicción, que resulta ser Seda.

26.      El resto de los empleados de LOF, cinco en total, no tienen preparación formal en medicina, psicología o trabajo social. Son ellos un manejador de expedientes, un capellán, un chofer y dos encargados de la seguridad de los residentes.[27]

27.      El 24 de diciembre de 2020, Jorge fue entrevistado por un empleado de LOF, quedando enterado que desde los 13 años consumía a diario Marihuana, Cocaína, Zanax, Percocet y Toradol. Además, que había usado Crack, Metanfetamina y Alucinógenos una vez. Y que recién, había empezado a consumir Heroína.

---

[21] Según Sentencia Parcial Nunc Pro Tunc del TPI los números del 16 al 19 en las determinaciones de hechos están duplicados, toda vez que hubo un error en la secuencia de estos.

[22] Íd., pág. 39, L. 19-20.

[23] Íd., pág. 12, L. 18-24.

[24] SUMAC, Entrada Núm. 53, Anejo 6 (Licencia expedida y Orden).

[25] Véase, Transcripción de la Deposición del señor Seda Olmo, pág. 16, L. 2-9.

[26] Íd., pág. 18, L.13-21.

[27] Íd., pág. 16-18.

28. Asimismo, quedó enterado de que había estado en dos programas de rehabilitación. Y había sido hospitalizado en cuatro ocasiones, dos de ellas por sobredosis de drogas, siendo la última en el Hospital Panamericano por trastorno de ánimo y uso de Marihuana, Cocaína y Opiáceos.[28]

29. Sobre su historial médico pasado, LOF quedó enterado de que Jorge padecía de depresión y alucinaciones por el uso de la Cocaína, entre otras condiciones. Y que era tratado por el psicólogo Eric Correa y el psiquiatra Justo Rodríguez, quien le había recetado Prozac – 40 mg en la mañana; Seroquel – 100 mg 3 veces al día; Trazadone – 150 mg en la noche, y Klonopin 1 mg 3 veces al día.[29]

30. El 24 de diciembre de 2020, al cabo de la entrevista, LOF preparó un PLAN DE TRATAMIENTO INDIVIDUALIZADO para Jorge que consistía de cinco fases trimestrales, a saber: a. Desintoxicación y mejoramiento físico; b. Mejoramiento del estado funcional, mental y emocional; c. desarrollo de carácter y liderazgo; d. preparación hacia la libre comunidad; y e. etapa ambulatoria.[30]

31. En la primera fase, se buscaría estabilizarlo y sacar del sistema residuos dejados por las drogas y el alcohol para que alcanzara una clarificación mental y una limpieza física y pudiera, al mismo tiempo, restablecer un estilo de vida sano y libre de sustancias.[31]

32. En la segunda, se identificarían las áreas donde las sustancias y el estilo de vida descontrolado de Jorge, le habían causado problemas de carácter y habían distorsionado su personalidad, autoestima y temperamento. En esta etapa se esperaba que desarrollara autocontrol físico y emocional.[32]

33. Y en la tercera, que es donde se encontraba Jorge cuando murió, se esperaba que comenzara a participar de talleres ocupacionales, así como también de proyectos de trabajo para que desarrollara el líder que tenía dentro.[33]

---

[28] SUMAC, Entrada Núm. 53, Anejo 8 (Expediente de LOF).
[29] Íd.
[30] SUMAC, Entrada Núm. 53, Anejo 9 (Expediente de LOF Part. 2).
[31] Íd.
[32] Íd.
[33] Íd.

34.        Surge del Plan que Jorge había sufrido: Trastorno inducido por uso de cocaína, THC y opioides.[34]

35.        El 27 de diciembre de 2020, Jorge suscribió un "Contrato de Admisión" con LOF por el que ésta se obligaba a darle "[t]ratamiento [e]specializado…de ayuda a drogas/alcohol o abuso de sustancias controladas "que incluía, entre otras cosas, "terapias individuales y grupales que conducirían a su rehabilitación en 3 áreas: psicológica, espiritual y física, por un periodo de 12 meses en sus facilidades y tres meses de forma ambulatoria".[35]

36.        El contrato fijaba un cargo adicional para hacerle evaluaciones médicas, pruebas y otros.[36]

37.        Sin embargo, para la provisión de servicios psicológicos, psiquiátricos y médicos a los participantes del programa, LOF los inscribía en el Plan Vital del Gobierno de Puerto Rico.[37]

38.        Seda, el manejador de casos y el capellán tenían a cargo las terapias grupales e individuales de adicción, espirituales, recreativas y de trabajo, pero solo el primero tenía una certificación de consejería en adicción.[38]

39.        En cuanto a las terapias psicológicas y tratamiento médico que LOF se obligó a darle a Jorge, lo refirió con APS y Migrantes del Oeste, ambos proveedores del Plan Vital.

40.        Por el contrato entre las partes, Jorge consintió a que se le hicieran pruebas de dopaje sin previo aviso y que LOF pudiera revisar sus pertenencias.

41.        En todo el periodo que estuvo recluido, solo le hicieron dos pruebas de dopaje: a. el 24 de diciembre de 2020, dando positivo para Marihuana, Cocaína y B20; y b. el 25 de abril de 2021, dando positivo para Marihuana. Es decir, cuatro meses más tarde de su admisión, Jorge consumió Marihuana estando recluido en las facilidades de LOF.[39]

---

[34] Íd.
[35] SUMAC, Entrada Núm. 53, Anejo 11 (Contrato de Admisión y su Reglamento).
[36] Íd.
[37] Íd.
[38] Véase, Transcripción de la Deposición del señor Seda Olmo, pág. 21-22.
[39] SUMAC, Entrada Núm. 53, Anejo 12 (Prueba de dopaje).

42.	De otra parte, Jorge se obligó por el contrato a asistir a todas las terapias y talleres del programa, así como a las reuniones en la iglesia.

43.	Asimismo, durante el primer mes, y sujeto a su comportamiento, Jorge podría llamar a su familia una vez por semana por 10 minutos. Pero no podría recibir llamadas de ninguna índole. Y cualquier emergencia se tramitaría a través de la administración.

44.	En cuanto a las visitas de familiares se refiere, según el contrato, las mismas comenzarían al mes de su ingreso y serían los domingos por tres horas de duración.

45.	A los tres meses de su ingreso, Jorge podría salir de pase con la familia por 8 horas siempre que, hubiese presentado una mejoría, buen comportamiento y cumplido con todas las actividades del programa. Además, podría salir de pase una vez al mes, hasta un máximo de 48 horas.

46.	Seda dijo que al regreso de cada pase a Jorge se le hacían pruebas de dopaje y se le sometía a un cateo minucioso de su persona y sus pertenencias.[40]

47.	LOF se reservaba el derecho de resolver el contrato en caso de incumplimiento con el contrato y su reglamento. Una de las causas de incumplimiento era el uso de drogas en las facilidades.

48.	El 27 de diciembre de 2020, Jorge suscribió también un "Relevo de Responsabilidad de Ingreso" eximiendo de toda responsabilidad a LOF por su tratamiento.[41]

49.	Surge del expediente de Jorge en LOF, que el 27 de diciembre, estaba: "…dispuesto[,] cooperador[,] buena actitud[,] llevadero[,] no verbaliza ideas suicidas u homicidas…Participante llega al hogar luego de presentar síntomas en sobredosis por uso de heroínas. Participante se vio involucrado en una situación en la que otro participante entró drogas al hogar y en medio de los dopajes el de él salió dudoso".

50.	Ese mismo día, surge del expediente de LOF que Jorge decidió "bajar medicamentos" y el manejador de

---

[40] Véase, Transcripción de la Deposición del señor Seda Olmo, pág. 25, L. 10-20.
[41] SUMAC, entrada núm. 62.

casos "lo orientó al respecto y supervisó el ajuste con efectividad."

51.     El 29 de diciembre, surge del récord de Jorge con LOF que: "Se ha estado llamando a la oficina del psiquiatra Justo Rodríguez, sale la grabadora se dejó mensaje y nada".

52.     Seda atestó en su deposición que Jorge recibía terapias psicológicas y psiquiátricas una o dos veces al mes. Sin embargo, de su expediente con APS surge que Jorge solo tuvo tres citas los días 24 y 27 de marzo; y el 25 de junio de 2021.

53.     En su primera cita, que fue por videoconferencia porque se había declarado la Pandemia del Covid-19, Jorge dijo sentirse "un poco ansioso". Que el precipitante de su ansiedad era "la soledad, que lo llevaba a consumir drogas". Además, que llevaba recluido en LAO tres meses por uso de sustancias controladas, específicamente "Heroína intravenosa dos días a la semana; Cocaína intravenosa diariamente; y 3 gramos de Marihuana diariamente". Jorge reconoció que el uso de drogas y alcohol le ocasionaba "problemas en el trabajo, la familia, económicos, salud y vida social". De otro lado, que "[t]uvo síndrome de retirada".[42]

54.     Al cabo de la entrevista, le diagnosticaron desorden de ansiedad con remisión del uso de opioides, cannabis y cocaína.[43]

55.     En la segunda cita, Jorge se quejó de que no podía dormir bien y que seguía con ansiedad e insomnio, pero poco a poco se había ido acoplando. De otro lado, indicó que quería descontinuar los medicamentos y disminuir el Seroquel. Además, que tenía historial de uso de cocaína y heroína que había descontinuado unos tres meses atrás, así como de historial mental. Que por sus condiciones había estado hospitalizado en el Panamericano cuatro meses atrás.[44]

56.     Al cabo de la cita, se le diagnosticó con desorden de ansiedad con remisión del uso de opioides, cannabis y cocaína. Y se le refirió a un médico generalista y cita en

---

[42] SUMAC, entrada núm. 53, Anejo 14 (Expediente médico de APS).
[43] Íd.
[44] Íd.

tres meses. Le recetaron Seroquel 100 mg antes de acostarse y Klonopin .5 mg dos veces al día.[45]

57.　　En la última cita dijo sentirse bien, estar estable y tolerar bien el Klonopin. Se veía tranquilo y de ánimo normal. Se reiteraron en los diagnósticos dados y recomendaron seguimiento psicológico y psiquiátrico.[46]

58.　　En el ínterin, el 5 de marzo de 2021, surge del récord de Jorge en LOF que estaba:

"...consistente en su actitud y disposición [.] Ha estado de buena disposición...[h]a estado teniendo un comportamiento excelente, [h]a tenido pases y los [h]a utilizado bien...no [h]a estado entrando con frecuencia a las terapias[,] pero se queda trabajando en tareas[.] [S]e le [h]a comunicado la necesidad de ir a las terapias no [h]a querido modificar en esta área a pesar de las múltiples indicaciones".[47]

59.　　El 27 de marzo de 2021, surge de su expediente en LOF que tenía:

"...buena actitud[,] mayor honestidad[,] compromiso[,] disposición[.] [N]o verbaliza ideas suicidas u homicidas". Asimismo, que "su actitud es positiva[,] reconoce al decirle o llamarle la atención[,] pero busca hacer o manejar los conflictos como líder a su forma o como el cree mejor[,] pero no como el hogar o las reglas lo determina".[48]

60.　　De otra parte, se documentó que Jorge:

...[h]a estado bajando medicamentos [,] se [ha] visto bien buen compromiso al tratamiento. Participante se dispone a cambiar cuando le llama la atención acepta consejo y ejecuta. Participante tiene buena conducta[,] pero presenta en momentos un pensamiento y actitudes adictivas y sede ante la presión de grupo sabiendo que lo que lo que está haciendo es incorrecto".[49]

61.　　El 13 de julio de 2021, surge del expediente de Jorge en LOF que presentaba "una actitud de cambio llegando a ser transcendental[,] donde[,] a pesar de poder tener algunos errores[,] [h]a aceptado y asimilado enmendado su comportamiento".[50]

---

[45] Íd.
[46] Íd.
[47] SUMAC, Entrada Núm. 53, Anejo 8 (Expediente en LOF), pág. 5.
[48] Íd., pág. 6.
[49] Íd.
[50] Íd., pág. 5.

62.      Tiempo después, el 24 de agosto de 2021, surge de su expediente en LOF que se le:

"...encontró muerto en un sofá de la casa con un buche de sangre saliendo de su boca. Se llamó a ambulancia, se llama a policía y a familia para notificar la pérdida. Al momento del chequeo de los oficiales de homicidios verificar el cadáver se encontró en la posesión del joven Jorge Martínez un deck de supuestamente heroína siguieron investigando número de querella 2021-1-10-068-356 Agente Miguel Ángel Chaparro placa 32472".[51]

63.      Seda atestó que, en las semanas previas, Jorge había permanecido en las facilidades de la institución y recibió una visita de sus familiares el sábado inmediatamente anterior.[52]

64.      Añadió que donde residía el joven se cerraban las puertas a las 7:00 p.m. Que el encargado de seguridad que pernoctaba en las facilidades ese día fue Guascar Castillo, quien lo llamó para avisarle lo ocurrido.[53]

65.      Seda llegó a las facilidades de LOF encontrándose con que Jorge "estaba acostado en el mueble de la sala...el cuerpo frío...morado un poco...como una baba saliéndole de la boca, seca, como con comida, algo así...tenía...como una espuma amarilla saliéndole de la boca...". Y llamó al 911.[54]

66.      Los paramédicos llegaron y corroboraron que Jorge no tenía signos vitales, llamando a la policía.[55]

67.      Del Informe de Querella de la Policía surge que a las 7:54 a.m., se recibió la llamada informando del fallecimiento de Jorge. El agente Nelson Hernández tomó fotos de la escena y le refirió el caso al agente Carlos Chaparro de la División de Homicidios de Aguadilla. El cadáver no presentaba signos de violencia. Fue trasladado a Forense.

68.      En la escena se ocupó al lado izquierdo del cuerpo sobre el sofá una envoltura de aluminio de color verde oscura doblada a manera de pastel que fue llevada a la Unidad de Drogas de Aguadilla donde el agente Pérez Fernández le realizó la prueba de campo arrojando

---

[51] Íd.
[52] Véase, Transcripción de la Deposición del señor Seda Olmo, pág. 25, L. 1-9.
[53] Íd., pág. 26.
[54] Íd., pág. 27.
[55] Íd.

positivo a Heroína. Este la embaló y la echó en un sobre; y el Fiscal autorizó su decomiso.

69.    Surge del informe de autopsia, por otra parte, que Jorge murió por una sobredosis de Fentanilo y Xilacina.[56]

70.    Seda reconoció que una vez Jorge se decidió por ingresar al programa, estaba bajo la custodia y el cuidado de LOF.[57]

71.    Seda reconoció que Jorge murió en las facilidades de LOF de una sobredosis de Fentanilo y Xilacina, según la autopsia, estando bajo su custodia inmediata.[58]

72.    Seda reconoció que "[e]l problema con... con las adicciones es que la incidencia de recaídas es bien altas". Además, que la adicción es una enfermedad que trastoca la familia.[59]

73.    En cuanto a la participación del padre mientras Jorge estuvo en LOF, este aceptó que "más allá de que la tía le comunicara" sobre el estado su progreso, no lo visitó personalmente porque se le informó que "solamente por teléfono una vez a la semana podían hablar quince [15] minutos y que la visita era restringida solamente a dos [2] personas y era muy poco tiempo. Entonces acordaron que la tía le mantendría informado de todas las cosas respecto a Jorge.[60]

74.    En resumen, que estaba dispuesto a ir, pero dado el caso de lo que la tía le explicó y la situación de que su madre era la que ocupaba ese tiempo, decidió no hacerlo.

75.    Sobre el tratamiento que se le daba en LOF dijo conocer que recibía unas terapias, que se le daba participación, deportes y que también se le daba ayuda espiritual.[61]

Sin embargo, ante unos errores mecanográficos contenidos en la *Sentencia Parcial*, el 21 de enero de 2025 la parte demandante

---

[56] SUMAC, entrada núm. 62.
[57] Véase, Transcripción de la Deposición del señor Seda Olmo, pág. 22-23.
[58] Íd., pág. 23.
[59] Íd., pág. 36, L. 5-9.
[60] Transcripción de la Deposición del señor Martínez Lleras, pág. 23.
[61] Íd., pág. 24.

presentó una *Solicitud de Sentencia Nunc Pro Tunc*[62]. Además, el 27 de enero de 2025, el demandado, mediante *Moción de Reconsideración* argumentó que los hechos enumerados en la *Sentencia Parcial* están en controversia. Pese a que este expresó haber controversia en los hechos, se limitó únicamente a indicar que estos: (1) no imputan negligencia; (2) eximen de responsabilidad; (3) regulan la relación bilateral entre el residente y LOF; (4) y los que fueron causados por el propio residente.[63] En desacuerdo con la *Moción de Reconsideración* presentada por LOF, la parte demandante presentó su escrito en oposición intitulado *Moción en Respuesta a Otra.*[64]

Así las cosas, el 4 de febrero de 2025 el TPI emitió *Sentencia Parcial Nunc Pro Tunc*[65] en la que corrigió los errores mecanográficos y en la que en su dictamen declara Ha lugar la solicitud de sentencia sumaría a favor de la parte demandada. Posteriormente, el 18 de febrero de 2025, a raíz de una *Moción Urgente de Enmienda Nunc Pro Tucn*[66] presentada el 5 de febrero de 2025 por la parte demandante, el TPI vuelve a emitir una *Sentencia Parcial Nunc Pro Tunc* en la que corrige su dictamen a favor de la parte demandante y en el que permaneció la negligencia en contra de demandado.[67] El 26 de febrero de 2025, el TPI mediante *Resolución Interlocutoria*[68] declaró No Ha Lugar la *Moción de Reconsideración* de la parte demandada.

Inconforme, LOF acudió ante nos mediante recurso de *Certiorari,* en el que alega que:

> **ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR E IMPUTAR NEGLIGENCIA ORDINARIA A LAND OF FREEDOM POR LA MUERTE DEL RESIDENTE DEBIDO A SU INCUMPLIMIENTO CON LA LEY MINISTERIAL DE LA ADMINISTRACIÓN DE SERVICIOS DE SALUD MENTAL Y CONTRA LA**

---

[62] SUMAC, Entrada Núm. 60.
[63] SUMAC, Entrada Núm. 62.
[64] SUMAC, Entrada Núm. 63.
[65] SUMAC, Entrada Núm. 65.
[66] SUMAC, Entrada Núm. 69.
[67] SUMAC, Entrada Núm. 70.
[68] SUMAC, Entrada Núm. 73.

**ADICCIÓN, LEY 408, SEGÚN ENMENDADA, LEY DE LA ADMINISTRACION DE SERVICIOS DE SALUD MENTAL CONTRA LA ADICCIÓN, LEY NÚM. 67-1993, SEGÚN ENMENDADA Y NEXO CAUSAL BAJO LA MISMA LEY ESTATUTARIA (ASSMAC) Y SUS REGLAMENTOS.**

El apelante sostiene en su recurso que el residente ocasionó su propia muerte y que el hecho que se encontrara en las facilidades de LOF no establece negligencia. A su vez, entiende que no hubo prueba que demostrara que la droga ingresó a la institución, sino que fue el mismo residente que la consumió y violó las cláusulas y condiciones del Contrato de Admisión. Por su parte, el apelado en su alegato en oposición arguye que se debe confirmar la *Sentencia Parcial Nunc Pro Tunc* por los mismos fundamentos en que el TPI basó su decisión.

## II.

### A. Sentencia Sumaria

Como sabemos, la sentencia sumaria es un mecanismo procesal provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R. 36, cuyo fin es proveer una solución justa, rápida y económica de los litigios. *Serrano Picón v. Multinational Life Ins.*, 212 DPR 981, 992 (2023); *González Santiago v. Baxter Healthcare*, 202 DPR 281, 290 (2019); *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 109 (2015). A tenor, dicho mecanismo procesal permite que un tribunal, disponga parcial o totalmente de litigios civiles en aquellos casos en los que no exista alguna controversia material de hecho que requiera ventilarse en un juicio plenario y el derecho así lo permita. *León Torres v. Rivera Lebrón,* 204 DPR 20, 41 (2020). La sentencia sumaria procede cuando "no existen controversias *reales y sustanciales* en cuanto a *los hechos materiales,* por lo que lo único que queda por parte del poder judicial es aplicar el Derecho". *Meléndez González et al. v. M. Cuebas, supra*, pág. 109 (citando a *Oriental Bank v. Perapi et al.*, 192 DPR 7, (2014); *SLG Zapata-Rivera*

*v. J.F. Montalvo*, 189 DPR 414, 430 (2013); *Nieves Díaz v. González Massas*, 178 DPR 820, 847 (2010)).

Al interpretar la precitada Regla el Tribunal Supremo ha expresado que debe dictarse sentencia sumariamente cuando el tribunal sentenciador tiene ante sí, de manera incontrovertible, la verdad sobre todos los hechos esenciales. *E.L.A. v. Cole*, 164 DPR 608, 625 (2005). De manera que, "una controversia de hecho es suficiente para derrotar una moción de sentencia sumaria [...] cuando causa en el tribunal una duda real y sustancial sobre algún hecho relevante y pertinente". *Pepsi-Cola v. Mun. Cidra et al.,* 186 DPR 713, 756 (2012). Se entiende que un hecho material es aquél que puede afectar el resultado de la reclamación acorde al derecho sustantivo aplicable. *Ramos Pérez v. Univisión,* 178 DPR 200, 213 (2010). Por lo que, no deberá dictar sentencia sumaria cuando: 1) existen hechos materiales controvertidos; 2) hay alegaciones afirmativas en la demanda que no han sido refutadas; 3) surge de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material; o 4) como cuestión de derecho no procede. *Pepsi-Cola v. Mun. Cidra, supra*, pág. 757; *S.L.G. Szendrey-Ramos v. Consejo Titulares,* 184 DPR 133, 167 (2011).

Al atender la moción de sentencia sumaria, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por la parte promovente. *E.L.A. v. Cole, supra*, pág. 626. No obstante, "la omisión en presentar evidencia que rebata aquella presentada por el promovente, no necesariamente implica que procede dictar sentencia sumaria de forma automática". *Mun. de Añasco v. ASES*, 188 DPR 307, 327 (2013) (citando a Córdova *Dexter v. Suncn. Ferraiuoli,* 182 DPR 541, 556 (2011)). A su vez, corresponde al juzgador actuar guiado por la prudencia y ser consciente de que su determinación podría implicar que se prive a una de las partes de

su "día en corte", elemento esencial del debido proceso de ley. *León Torres v. Rivera Lebrón, supra,* pág. 44. Cónsono con lo anterior, nuestro más alto foro ha resuelto que, existen litigios y controversias que "por su naturaleza no resulta aconsejable resolverlos mediante una sentencia dictada sumariamente; ello, en vista de que en tales casos un tribunal difícilmente podrá reunir ante sí toda la verdad de los hechos a través de affidávits, deposiciones o declaraciones juradas". *Jusino et als. v. Walgreens*, 155 DPR 560, 579 (2001) (citando a *Soto v. Hotel Caribe Hilton*, 137 DPR 294, 311 (1994); *García López v. Méndez García*, 88 DPR 363, 379 (1963). Dicho foro ha identificado como posibles controversias de este tipo aquellas que incluyen: "elementos subjetivos, es decir, aquellas en las que el factor credibilidad juegue un papel esencial o decisivo para llegar a la verdad, y donde un litigante dependa 'en gran parte de lo que extraiga del contrario en el curso de un juicio vivo'. *Audiovisual Lang. v. Sist. Est. Natal Hnos.*, 144 DPR 563, 577 (1997).

En lo pertinente, la Regla 36 de Procedimiento Civil, *supra*, impone unos requisitos de forma con los cuales hay que cumplir al momento de promover una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. 32 LPRA Ap. V, R. 36.3; *Oriental Bank v. Caballero García,* 212 DPR 671, 679

(2023). Si la parte promovente incumple con estos requisitos, "el tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas, supra*, pág. 111.

Asimismo, la parte que se opone a una sentencia sumaria tiene que cumplir con los requisitos de la precitada Regla 36, *supra*. *Oriental Bank v. Caballero García, supra*, pág. 680. En otras palabras, la parte que desafía dicha solicitud no podrá descansar en las aseveraciones o negaciones consignadas en su alegación. *León Torres v. Rivera Lebrón, supra*, pág. 43. Así pues, en la oposición a una solicitud de sentencia sumaria, la parte promovida debe "puntualizar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte sentencia sumaria en su contra". Íd., pág. 44. Entiéndase que, "la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa". Íd. De lo contrario, corre el riesgo de que se dicte sentencia en su contra. *Oriental Bank v. Caballero García, supra*, pág. 680.

Al evaluar una moción de sentencia sumaria, el Tribunal de Apelaciones está en la misma posición del Tribunal de Primera Instancia. *Serrano Picón v. Multinational Life Ins., supra*, pág. 993; *Meléndez González et al. v. M. Cuebas, supra*, pág. 118. Tómese en cuenta que, nuestra revisión es una *de novo* y debemos basar nuestro análisis por las disposiciones de la Regla 36 de Procedimiento Civil, *supra*, así como de su jurisprudencia interpretativa. A tenor, nuestro más alto foro ha esbozado los criterios que deben guiar esta revisión. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679-680 (2018); *Meléndez González et al. v. M. Cuebas, supra*, págs. 118-119. Por ello, el Tribunal de Apelaciones debe:

1) examinar *de novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario;

2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra;*

3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, *supra*, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos y;

4) de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al., supra*, pág. 679.

Ahora bien, estamos limitados en cuanto a: (1) que no podemos tomar en consideración evidencia que las partes no presentaron ante el foro primario, y (2) tampoco adjudicar los hechos materiales en controversia, ya que ello le compete al tribunal de instancia luego de celebrado un juicio en su fondo. *Meléndez González et al. v. M. Cuebas, supra*, pág. 118. Al realizar nuestra revisión *de novo* debemos "examinar el expediente de la manera más favorable hacia la parte que se opuso a la Moción de Sentencia Sumaria en el foro primario, llevando a cabo todas las inferencias permisibles a su favor". Íd.

### B. Daños por negligencia

El Art. 1536 del Código Civil del 2020, 31 LPRA sec. 10801, dispone que toda persona que por culpa o negligencia cause daño a otra, está obligada a reparar el daño causado. No obstante, para que proceda una acción de daños se debe cumplir con lo siguiente: (1) el acto u omisión culposa o negligente; (2) la relación causal entre el acto u omisión culposa o negligente y el daño ocasionado; y (3) el daño real causado al reclamante. *Inmob. Baleares et al. v. Benabe et*

*al.* 2024 TSPR 112; *Mena Pamias v. Jiménez Meléndez,* 212 DPR 758, 768 (2023); *Nieves Díaz v. González Massas*, 178 DPR 820, 843 (2010).

Ahora bien, la culpa o negligencia consiste además en la falta del debido cuidado, el no anticipar y prever las consecuencias racionales de un acto u omisión, que una persona prudente y razonable habría evitado en las mismas circunstancias. *Mena Pamias v. Jimenez Melendez, supra*; *Pérez et al. v. Lares Medical et al.,* 207 DPR 965, 976-977 (2021); *López v. Porrata Doria*, 169 DPR 135, 150 (2006); *Toro Aponte v. E.L.A.*, 142 DPR 464, 473 (1997). Es decir, "el deber de previsión es el criterio central para que se adjudique responsabilidad por culpa o negligencia". *Cruz Flores v. Hospital Ryder Memorial Inc.,* 210 DPR 465, 484 (2022).

No obstante, el deber de previsión no se extiende a todo riesgo posible, más bien, se debe evaluar si tal daño aparece como la consecuencia razonable y ordinaria del acto que fue negligente. *Montalvo v. Cruz*, 144 DPR 748, 756–757 (1998). De modo que, la "norma es que el riesgo que debe preverse debe estar basado en probabilidades y no en meras posibilidades". *López v. Porrata Doria, supra*, págs. 164–165.

El Tribunal Supremo ha reconocido que existen ciertas actividades específicas que conllevan un deber especial de vigilancia, cuidado y protección de quien las lleve a cabo hacia el público en general o hacia ciertas personas en particular. *Administrador v. ANR*, 163 DPR 48, 60 (2004); *Ramírez v. E.L.A.*, 140 DPR 385, 394–395 (1996). "Esta responsabilidad, que genera un deber de cuidado mayor del exigible a una persona cualquiera, se fundamenta en las circunstancias de la situación —entiéndase, el tiempo, el lugar y las personas— y en las exigencias de la obligación particular en la que se sitúan los involucrados". *Administrador v. ANR, supra,* pág. 60.

En *Crespo v. H.R Psychiatric Hosp., Inc.,* 114 DPR 796 (1983), el Tribunal Supremo atendió un caso de un paciente que se suicidó estando bajo custodia de un hospital psiquiátrico. Allí, nuestro más alto foro local dispuso que el hospital no tiene la obligación de prever todo peligro imaginable que pueda amenazar la seguridad del paciente, sino aquellos que con algún grado de probabilidad serían previstos por una persona prudente y razonable. Íd., pág. 800. Ahora bien, no existe responsabilidad si el paciente nunca había dado indicios. Íd., pág. 801.

Por otra parte, entre dicho acto culposo o negligente y el daño sufrido debe existir un nexo causal adecuado. Esto se conoce en nuestro ordenamiento como la doctrina de la causalidad adecuada, la cual "no es causa toda condición sin la cual no se hubiera producido el daño, sino la que ordinariamente lo produce según la experiencia general". *Montalvo v. Cruz, supra,* pág. 756 (citando a *Soc. de Gananciales v. Jerónimo Corp.,* 103 DPR 127, 134 (1974). De manera que, para surgir el elemento del nexo causal, debe de existir una relación entre el daño y la consecuencia razonable, común y natural de la acción u omisión imputada al autor demandado. Sin embargo, el nexo causal adecuado no es la causa de toda condición sin la cual no se hubiera producido el resultado, más bien, es la que ordinariamente lo produce según la experiencia general. *Pérez et al. v. Lares Medical et al., supra,* págs. 976–977; *López v. Porrata Doria, supra,* págs. 151-152; *Soc. de Gananciales v. Jerónimo Corp., supra,* pág. 134.

Ahora bien, en algunos casos puede concurrir una acción de incumplimiento contractual y violación al deber general de no causar daño a otro. *UIA v. Santander Securities y otros,* 2024 TSPR 81, 15 (2024) (citando a *Consejo de Titulares v. Mapfre,* 208 DPR 761, 781 (2022). En estos casos, el demandante deberá elegir entre una de las dos causas de acción disponibles, considerando cuál lo

beneficiaria mejor en vindicar sus derechos. Esto se debe a que "las causas de acción, alternativas o independientes son acumulables. Sin embargo, no se autoriza la duplicidad de remedios. Por lo tanto, el perjudicado debe seleccionar entre las acciones disponibles. Esta selección se deduce de las alegaciones y de la prueba que este presente." *UIA v. Santander Securities y otros, supra,* pág. 15 (2024).

### C. Ley ASSMCA

Se aprobó la Ley 408-2000 para complementar la Ley ASSMCA, con el fin de, entre otras cosas, actualizar las necesidades de tratamiento, recuperación y rehabilitación de la salud mental en Puerto Rico. El Artículo 1.06(pp) de la Ley 408-200 establece que las organizaciones de base comunitaria, con o sin fines de lucro, deben estar debidamente organizadas y certificadas por el Departamento de Estado de Puerto Rico. 24 LPRA sec. 6152b. Estas deben tener como fin el desarrollar programas de servicios consistentes a su misión y objetivos, los cuales pueden incluir la orientación, consejería, ayuda, apoyo y servicios de tratamiento, recuperación y rehabilitación a personas que necesitan servicios de salud mental, incluyendo el abuso de drogas y/o alcohol. Íd.

Así pues, el Capítulo XIII de la Ley 408-2000, contiene todo lo concerniente a tratamientos relativos al abuso y dependencia de sustancias controladas o alcohol. En lo aquí pertinente, el Artículo 13.01 de la referida ley exige que el tratamiento para personas que sufran una dependencia a sustancias o alcohol, debe suministrarse por "un equipo interdisciplinario compuesto por profesionales de la salud mental, según lo determine el estudio individual de caso realizado inicialmente por el médico indica". 24 LPRA sec. 6164. A su vez, dispone que estos profesionales deben poseer una especialidad o educación continua en el campo de las adicciones. Íd. La misma ley permite a las organizaciones de base comunitaria, con

o sin fines de lucro, integrar al personal consejeros y/o guías espiritual-pastoral. Íd.

Por otra parte, la Ley 408-2000 tiene como limitación que "el valor terapéutico del proceso intrahospitalario de la desintoxicación sea determinado por el psiquiatra y el equipo interdisciplinario". Íd. Esto, en consideración con el perfil y condición de cada individuo al momento de la solicitud del servicio. Así pues, entre las condiciones mínimas en que debe darse dicho tratamiento está la monitorización del uso de drogas continuamente, en forma periódica y de acuerdo con el historial clínico de la persona. Íd.

Por otra parte, el Artículo 8, Capítulo III del Reglamento Núm. 8283, exige a las entidades reguladas por ASSMCA adoptar los trece (13) principios del "National Institute on Drug Abuse" para un tratamiento efectivo. Entre sus principios, se ordena que la supervisión constante del paciente, ya que durante el tratamiento pueden haber recaídas. Art. 8(11) del Reglamento Núm. 8283. Además, la supervisión del uso de drogas durante el tratamiento, mediante los análisis o exámenes necesarios, puede ayudar al paciente a resistir sus impulsos de usar drogas. Íd. "Esta clase de supervisión también puede proporcionar una evidencia temprana del uso de drogas para que el plan de tratamiento del paciente pueda ser reajustado". Íd. A su vez, puede servir como un elemento importante en la supervisión el que los resultados salgan positivos a drogas. Íd.

**III.**

El apelante alega que erró el TPI al declarar Con Lugar la *Moción de Sentencia Sumaria Parcial* a favor del apelado. El apelante entiende que el TPI incidió porque no se pudo establecer falta de supervisión, cuidado o negligencia de parte de LOF. Añade que no se pudo demostrar que la droga que causó la muerte de Jorge haya

sido inducida o suministrada por LOF. Por último, sostiene que LOF cumplió las leyes reguladoras y el tratamiento indicado.

Según surge del expediente que Jorge era usuario de drogas desde los quince (15) o dieciséis (16) años.[69] Lamentablemente durante su vida tuvo varias recaídas en el consumo de las drogas, lo cual motivó que a sus veintitrés (23) años ingresara a LOF de forma voluntaria. En esencia, este consumía a diario Marihuana, Cocaína, Zanax, Percocet y Toradol.[70] Además, que había usado Crack, Metanfetamina y Alucinógenos una vez, y que recién, había empezado a consumir Heroína. Jorge estuvo en dos programas de rehabilitación y había sido hospitalizado en cuatro (4) ocasiones, dos (2) de ellas por sobredosis de drogas, siendo la última en el Hospital Panamericano por trastorno de ánimo y uso de Marihuana, Cocaína y Opiáceos.

Así pues, el 24 de diciembre de 2020 Jorge ingresó a LOF y en su primera prueba de dopaje de ese mismo día salió positivo a THC, cocaína y B20. Luego, surge del expediente de Jorge en LOF, que tres (3) días después de su ingreso, la evaluación bi-semanal se detalló que el "[p]articipante llega al hogar luego de presentar síntomas en sobredosis por uso de heroínas. El participante se vio involucrado en una situación en la que otro participante entró drogas al hogar y en medio de los dopajes, el de él salió dudoso".[71] Posterior a ese evento, las evaluaciones de Jorge en su mayoría fueron positivas, pero aún reflejaban que este debía ser monitoreado continuamente. En específico, en la evaluación de marzo de 2021, Jorge expresaba pensamientos y actitudes adictivas.[72] Posteriormente, se expresó en una evaluación que Jorge "no estaba

---

[69] Véase, Transcripción de la Deposición del señor Martínez Lleras, pág. 11.
[70] SUMAC, Entrada Núm. 53, Anejo 9 (Expediente en LOF Part. 2), págs. 5-8.
[71] SUMAC, Entrada Núm. 53, Anejo 8 (Expediente en LOF), pág. 7.
[72] Íd., pág. 6.

entrando con frecuencia a las terapias y a pesar de que se le había llamado la atención sobre ello no modificó".[73]

Así las cosas, el 25 de abril de 2021, en la segunda y última prueba de dopaje realizada a Jorge por LOF, arrojó positivo a Marihuana. Es decir, a los cuatro (4) meses de Jorge ingresar a LOF, este seguía consumiendo drogas. Posterior a ello, no se le hizo ninguna otra prueba de dopaje y cuatro (4) meses después, el 24 de agosto de 2021, lamentablemente falleció de una sobredosis.

En la deposición, el señor Seda Olmo indicó que Jorge no había salido por lo menos hacía dos (2) semanas antes de su muerte.[74] Al regreso de cada salida de los residentes, LOF tenía como protocolo el hacer un registro completo, que incluía verificar cualquier pertenencia que haya traído y el desnudarse frente al personal de LOF.[75] Añadió el señor Seda Olmo que la última visita de Jorge fue un familiar el sábado antes de su muerte.[76] La noche antes de la muerte de Jorge, el personal cerró las puertas a las 7:00 p.m. y en la mañana se encontró a Jorge sin vida.[77] No obstante, es un hecho que se desconoce la persona que le suministró la droga a Jorge.[78]

Cónsono con lo anterior, del Reglamento de LOF no surge el protocolo a seguir cuando un residente arroja positivo en una prueba de dopaje. Tampoco se indica el protocolo a tomar cuando los residentes entran drogas al centro o en los casos que un residente aparezca con síntomas de sobredosis. Únicamente dicho Reglamento establece que el quebrantamiento de algunas de las reglas puede conllevar sanciones o incluso la expulsión sin

---

[73] SUMAC, Entrada Núm. 53, Anejo 8 (Expediente en LOF), pág. 5.
[74] Véase, Transcripción de la Deposición del señor Seda Olmo, pág. 25.
[75] Íd.
[76] Íd.
[77] Íd., pág. 26.
[78] Íd.

rembolso.[79] Nótese que, en ninguna parte se indicó que LOF tomara medida alguna de las circunstancias anteriores. Esto es importante, ya que según vimos la condición mínima para que LOF cumpliera con sus leyes reguladoras era que el tratamiento estuviese monitoreado continuamente, en forma periódica y de acuerdo con el historial clínico de la persona. Puesto que el proceso de rehabilitación de una persona adicta a drogas es complejo y puede tener múltiples recaídas.

Conviene añadir, que de la deposición del señor Seda Olmo se puede observar la escasez de empleados en LOF, que pudo tener como consecuencia la falta de supervisión de Jorge. En promedio la facilidad contaba con veinticinco (25) a treinta (30) participantes y un total de cinco (5) empleados, dos (2) de los cuales son del personal de seguridad.[80]

Según expusimos, la negligencia se define como la falta del debido cuidado que consiste en no anticipar y prever las consecuencias racionales de un acto u omisión, que una persona prudente y razonable hubiera previsto en las mismas circunstancias. Es un hecho indiscutible que, por los antecedentes de Jorge, era previsible que en el estado en que se encontraba el consumir drogas podía ocasionarle su muerte, más aún cuando ya éste había participado de programas de rehabilitación y había sido hospitalizado en dos (2) ocasiones por eventos de sobredosis antes de entrar a LOF.[81] Por ello, en este caso, el apelante tenía pleno conocimiento del perfil de Jorge y de que éste aún seguía consumiendo drogas estando en LOF. Incluso, surge del expediente de Jorge en LOF que desde el primer mes que éste ingresó a las facilidades de LOF se había indicado en la evaluación que otro

---

[79] SUMAC, Entrada Núm. 53, Anejo 11 (Contrato de Admisión y su Reglamento), pág. 6.
[80] Véase, Transcripción de la Deposición del señor Seda Olmo, pág. 16.
[81] Véase, Transcripción de la Deposición del señor Martínez Lleras, pág. 15.

participante había entrado drogas al hogar y la prueba de dopaje de él había salido dudosa.

En la Oposición de LOF para que se dictara sentencia sumaria no se presentó ninguna evidencia documental para rebatir los planteamientos de la parte demandante sobre la falta de vigilancia y supervisión. No hay ninguna evidencia documental ni surge del expediente las medidas cautelares que LOF tomó para prevenir la entrada de drogas en sus facilidades. Igualmente, cuando Jorge salió positivo a Marihuana, luego de cuatro (4) meses de estar bajo custodia de LOF, no surge que estos hicieran una investigación para esclarecer de dónde se obtuvo la droga. Luego de dicho suceso, tampoco surge que se haya implementado nuevas medidas de seguridad para prevenir la entrada de drogas a sus facilidades. Peor aún, luego de que Jorge diera positivo a Marihuana no se le hizo otra prueba de dopaje que confirmara que ya no estaba consumiendo drogas.

Como se indicó anteriormente, el deber de previsión no se extiende a todo riesgo posible, más bien, se debe evaluar si tal daño aparece como la consecuencia razonable y ordinaria del acto que fue negligente. Conviene señalar, que la supervisión de personas adictas a las drogas y/o alcohol debe ser aún mayor, principalmente, como en el caso que nos ocupa, ya la persona mantiene un historial clínico de adicción. De manera que, los análisis o exámenes continuos durante el tratamiento puede ayudar al paciente a resistir sus impulsos de usar drogas. En este caso, se demuestra claramente la negligencia de LOF ante la ausencia de vigilancia adecuada de Jorge en sus facilidades. Coincidimos con el foro primario en que era previsible que, con el historial que tenía Jorge, si no se tomaban las medidas necesarias para que este no consumiera drogas, este podía morir de una sobredosis. Por tanto, la falta de protocolo y

supervisión de LOF fue con toda probabilidad lo que ocasionó la muerte de Jorge.

**IV.**

Por los fundamentos antes expuestos se confirma la *Sentencia Parcial Nunc Pro Tunc* apelada.

Notifíquese.

Lo acordó el Tribunal, y lo certifica la Secretaria del Tribunal.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones